UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                             Case No. 24-CR-65

GREGORY OWENS,

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant owned a substance use treatment clinic, GRO Family Services (GRO). Given the nature of that business, his clients were vulnerable people who trusted him to help them with their addiction. Defendant abused that trust to feed his greed. By taking advantage of his patients, Defendant was able to solicit and receive over $400,000 in kickbacks from Justin Hanson and Mohammed Kazim Ali, the owners of a urine drug testing laboratory called Noah Associates. Defendant got that money by ordering millions of dollars of unnecessary drug tests from the laboratory. But Defendant's greed was not limited to taking advantage of his own patients. He also used his relationship with the owner of another clinic, Jesse Crawford Recovery Center (JCRC), to arrange for JCRC to order unnecessary urine drug tests for its patients from Noah Associates too. Defendant received additional kickbacks for each test ordered by JCRC. Defendant's kickback conspiracy significantly harmed the Medicaid and Medicare programs, to the tune of $2.2 million spent on drug tests that patients did not need.

Defendant's theft from Medicaid and Medicare and his abuse of the trust of GRO's patients does not, however, tell the entire story. To earn the kickbacks, Defendant used, without authorization, the credentials and signature of a physician to order the unnecessary tests. (PSR ¶

28). In addition to misusing an unsuspecting doctor's credentials, Defendant also involved two other individuals, his wife, J.O., and another family member, J.J., to receive, and thus conceal, the kickbacks. Defendant's selection of J.J., in particular, was noteworthy: She was a single parent raising three children on a retail-job salary, and Defendant took advantage of her circumstances to ensure that she would keep the payments secret and provide him almost all of the kickback money funneled through her. (PSR ¶ 21).

The Sentencing Guidelines provide for a sentence of 21-26 months' imprisonment.[1] The United States, in the plea agreement, agreed to recommend a sentence no higher than the bottom of the Guidelines' range as determined by the Court. (ECF 2, ¶ 23). In light of the significant financial harm suffered by Medicaid and Medicare, Defendant's abuse of the trust of GRO's patients, his theft of a physician's credentials to further his scheme, his efforts to conceal his crime, and the scope and length of the kickback conspiracy, a significant sentence is warranted here. At the same time, Defendant took responsibility, is a supportive husband and father, and deserves credit for the reasons stated in the government's sealed submission today. Balancing these facts, the United States recommends that the Court impose a sentence of 18 months' imprisonment and a two-year period of supervised release.

**I.      The Section 3553(a) Factors Support a Significant Term of Imprisonment.**

Section 3553(a) provides that the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the familiar purposes of federal sentencing. The United States focuses on three of those factors, all of which support the imposition of the recommended 18-month sentence: (1) the nature of the offense; (2) the history and characteristics of the defendant;

---

[1] *See* Government's sealed submission filed today.

and (3) the need for the sentence to reflect the seriousness of the defense, to afford adequate deterrence, and to protect the public. *See* 18 U.S.C. § 3553(a)(1) & (2).

### A. The Nature of the Offense

Defendant's kickback conspiracy was a serious offense. As described below, Defendant caused the Medicaid and Medicare programs to suffer substantial financial losses over the course of a three-year long scheme involving hundreds of patients at two clinics. Defendant, moreover, knew well that his receipt of the kickbacks was illegal. And the seriousness of Defendant's crime is further underscored by the facts that, to implement the scheme, Defendant manipulated a single mother trying to provide for her children, stole an unsuspecting doctor's credentials, and took advantage of vulnerable patients.

First, Defendant's kickback scheme caused the Medicaid and Medicare programs to suffer significant financial losses. Indeed, Medicaid paid over $1.9 million for urine drug tests ordered as a result of the kickback scheme. (PSR ¶ 32). Medicare paid another $328,821 for tests procured through the kickbacks. (*Id.*). The financial losses suffered by Medicare and Medicaid are not only significant in amount—again, over $2.2 million—but also because the Medicare and Medicaid programs benefit some of the most vulnerable in our community. Medicare provides medical coverage primarily for the elderly, and Medicaid provides medical coverage primarily for the impoverished. Given the seemingly ever-increasing costs of medical care and perennial concerns about funding for Medicare and Medicaid, Defendant's kickback scheme, in a very real sense, stole funds from these vulnerable groups to line his own pockets.

The scope and duration of Defendant's kickback scheme also demonstrate the serious nature of his criminal misconduct. Defendant's kickback conspiracy with Hanson and Ali lasted years (and ended only because of the government's investigation). (PSR ¶ 26). The scheme

3

involved the referral of hundreds of patients to Noah Associates for thousands of tests. Defendant also was not satisfied with earning kickbacks for referring patients from his business, GRO, but also expanded the conspiracy to encompass patients another clinic, JCRC, to earn even more kickbacks. (PSR ¶ 16). Defendant thus did not engage in one or two isolated instances of misconduct, but rather a long-term pattern of referring patients to earn kickbacks.

Defendant, moreover, knew what he was doing was wrong and that his kickback conspiracy was illegal. As the owner of GRO, which he opened over a decade prior to the kickback conspiracy, Defendant signed multiple provider agreements with Medicaid and Medicare in which he agreed to comply with the Anti-Kickback Statute. (PSR ¶ 11). Despite his decade-plus running GRO and his repeated agreement not to solicit or receive kickbacks in exchange for patient referrals, Defendant nonetheless explicitly agreed to refer patients to Noah Associates in exchange for illegal kickbacks of $18 per urine sample sent to Noah for testing. (PSR ¶ 14). There is no question Defendant knew that these payments were kickbacks: Defendant told J.J. that the amount of the payments from Noah depended on the number of samples sent to Noah and he received texts and emails from Hanson tracking the number of urine samples sent to Noah. (PSR ¶ 25). Defendant also knew that GRO's patients were covered by Medicaid and Medicare. Defendant thus knew exactly what he was getting paid for: referrals resulting in Medicare and Medicaid payments, the very thing prohibited by the Anti-Kickback Statute.

Lest any doubt remain about his knowledge, Defendant undertook substantial efforts to conceal the kickback payments. Defendant, Hanson, and Ali agreed to hide the kickback payments by having Noah Associates purportedly hire Defendant's wife, J.O., and, later, another family member, J.J., and make the payments to them. (PSR ¶¶ 14-15, 17-19, 20-24). To paper the illegal scheme, Defendant had J.O. meet with Ali and sign sham agreements stating that she would

4

perform marketing services for Noah Associates and comply with the Anti-Kickback Statute. (PSR ¶ 17). As Defendant knew, however, his wife never performed any marketing services for Noah Associates. (PSR ¶ 18). Instead, the payments to his wife were kickbacks based on the number of samples sent to Noah Associates for testing. (PSR ¶ 19).

After receiving over $150,000 in kickbacks funneled through his wife from November 2017 through February 2019, Defendant, Hanson, and Ali agreed that the payments would be made through J.J. (PSR ¶¶ 19; 21-22). As noted, J.J. was a single mother raising three children that she had with J.O.'s son while working a full-time retail job. (PSR ¶¶ 20, 23). J.J. met with Hanson and, like J.O., made a sham agreement to act as Noah Associates' sales rep and comply with the Anti-Kickback Statute. (PSR ¶ 22). As Defendant knew, however, J.J. never performed any work for Noah Associates. (PSR ¶ 23). Noah Associates nonetheless funneled over $260,000 in kickbacks through J.J. to Defendant from early 2019 through September 2020. (PSR ¶ 24). Defendant, moreover, helped J.J. set up a separate bank account to hold these payments; caused J.J. to withdraw about $200,000 in cash from that account, most of which J.J. gave to Defendant; took the debit card associated with that account; and told J.J. not to discuss the payments from Noah Associates with anyone, including anyone else in the family. (PSR ¶¶ 21; 24). Defendant's sophisticated, years' long efforts to hide the kickback payments demonstrate that he knew his conduct was illegal.

Defendant, moreover, improperly used the credentials and signature of a physician to further his kickback scheme. Dr. M.P. served as GRO's medical director from 2008 until November 2019. (PSR ¶ 27). By the time of the kickback conspiracy, however, Dr. M.P. had only infrequent meetings with Defendant and other staff at GRO, and at those meetings, he merely reviewed single-page treatment plans that lacked any information about the frequency or type of

drug testing performed for GRO's patients. (*Id.*) Dr. M.P. did not order any urine drug tests for GRO's patients from Noah Associates and did not review the results from any such testing. (PSR ¶ 28). Medicaid and Medicare, however, will only pay for urine drug tests that are necessary for treatment and ordered by a physician or other licensed medical provider. (*Id.*) To ensure that the kickback scheme worked, Defendant thus used Dr. M.P.'s credentials and signature, without authorization, to order tests for GRO's patients from Noah Associates. (*Id.*) For example, GRO submitted forms to Noah to set up a testing protocol for GRO's patients, and although the form purportedly has Dr. M.P.'s signature on it, Dr. M.P. denied that he signed the form or that any of the other handwriting on the form is his. (*Id.*) Indeed, other GRO staff confirmed that Defendant pushed for patients to provide as many urine samples as possible—which, of course, increased the amount of the kickback payments. (*Id.*)

Dr. M.P. also confirmed that the tests performed by Noah Associates were not medically necessary. (PSR ¶ 29). For example, in violation of applicable Medicare and Medicaid rules, Defendant referred GRO's patients to Noah Associates for definitive drug testing—an expensive, sophisticated form of testing—every three-to-seven days for months or even years. (*Id.*) Dr. M.P. would not have ordered these tests and did not believe they were necessary for treatment. (*Id.*)

Finally, in addition to using a physician's credentials without authorization to further his scheme, Defendant also abused the trust that patients placed in GRO. GRO's patients were vulnerable individuals dealing with addiction. Rather than looking to their best interests, Defendant used them (and their government health insurance) to earn kickbacks to line his pockets. Defendant may argue that he engaged in the kickback conspiracy not for his own gain, but to earn money used to provide care to GRO's patients. Such an argument is undercut by the State of Wisconsin's repeated findings that GRO failed to provide appropriate care. *See* Exhibit 1,

Wisconsin Department of Health Services' Survey Report of GRO Family Services, Dated 8/1/24. For example, the State found that GRO provided residential services without a license to do so. *Id.* at p. 14. GRO also lacked a medical director, an on-site substance abuse counselor, and a mental health professional to care for its patients. *Id.* at pp. 18 & 20. GRO even hired an individual previously convicted of murder without taking any of the steps required by the State to ensure that the individual was rehabilitated. *Id.* at 25. Finally, GRO required its patients to provide their Wisconsin Foodshare (SNAP) benefits so that GRO could use those benefits to buy food. *Id.* at 27. In light of these findings and Defendant's fraud, Wisconsin Medicaid will no longer pay for any services performed at GRO. (PSR ¶ 77). These facts belie any contention that Defendant engaged in this scheme to benefit GRO's patients.

B. **Defendant's History and Characteristics**

Defendant falls into criminal history category I. His criminal history, however, is understated because he was able to get away with his kickback conspiracy for three years. Indeed, we now know that Defendant was committing crimes—violations of the Anti-Kickback Statute, conspiracy, and identity theft—during a years' long scheme. Defendant's willingness to commit these multiple crimes for years shows that he poses a risk of recidivism.

Defendant may argue this his history of family support and employment counsel against a significant term of imprisonment. Though his status as a supportive father and husband are certainly mitigating, Defendant's family support and employment, here, are at least as aggravating as they are mitigating. Prior to engaging in the kickback conspiracy, Defendant maintained consistent, middle-class employment and owned a business. (PSR ¶¶ 76-78). He also was married and apparently maintained a good relationship with his family. (PSR ¶¶ 62-64). Many defendants who appear for sentencing in this Court point to troubling histories and argue they had few options

other than to commit their crimes. They argue that they had to commit crime out of a sense of necessity, or because of a lack of education, or due to addiction. Even defendants in white-collar cases often make such arguments. *See, e.g., United States v. Dikiara*, 50 F. Supp. 3d 1029, 1031-32 (E.D. Wis. 2014). But Defendant cannot even attempt to make such an argument here. Instead, it is clear that the explanation for Defendant's crime is greed.

On the other hand, Defendant ultimately admitted his crimes and timely notified the United States of his intention to enter a plea of guilty. He also deserves credit for the reasons stated in the Government's sealed submission filed today. These facts lead the United States to recommend a below-Guidelines sentence of 18 months' imprisonment.

### C. The Seriousness of the Offense, the Need for Deterrence, and the Public's Interest

Defendant's offense is undoubtedly serious. Defendant engaged in a fraudulent kickback scheme for three years. That scheme abused patients' trust, involved the theft of a physician's credentials, and cost the government over $2.2 million. This serious, white-collar offense is precisely the kind of crime that calls out for a period of incarceration in order to promote both deterrence and public safety.

Indeed, the Seventh Circuit has repeatedly "endorsed the idea that white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). This court has also recognized that the concept of "general deterrence may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are rational actors who would be dissuaded by the prospect of prison." *United States v. Goss*, 325 F. Supp. 3d 932, 935 (E.D. Wis. 2018) (Adelman, J.).

8

Case 2:24-cr-00065-LA   Filed 10/02/24   Page 8 of 9   Document 12

To ensure that Defendant and others similarly situated are deterred from future healthcare fraud offenses, the Court should impose a significant term of imprisonment. Only a significant prison term will show potential offenders that the risks of engaging in healthcare fraud outweigh the potential financial rewards.

**II.     Conclusion**

Defendant's kickback scheme lasted years, involved hundreds of patients, and caused Medicare and Medicaid to suffer losses in the millions of dollars. Defendant, moreover, knew well that he was violating the law. He also knew well that he was misusing a physician's credentials without authorization to further his scheme. Defendant had no problem breaking the law and the trust of patients to satisfy his greed. But Defendant also accepted responsibility and deserves credit for his actions described in the sealed submission filed today. In light of all of these facts, the United States suggests that an 18-month sentence is sufficient, but not greater than necessary, to vindicate the sentencing purposes codified in Section 3553(a).

Dated at Milwaukee, Wisconsin, this 2nd day of October, 2024.

                              Respectfully submitted,

                              GREGORY J. HAANSTAD
                              United States Attorney

By:    <u>/s Michael Carter</u>
         Michael Carter
         Assistant United States Attorney
         Eastern District of Wisconsin
         State Bar No. 1090041
         517 East Wisconsin Avenue
         Milwaukee, WI  53202
         (414) 297-4101
         Fax: (414) 297-4394
         Michael.A.Carter@usdoj.gov